## SEWERS—ESTOPPEL—WATERS AND WATER COURSES— ASSESSMENTS.

[Lucas (6th) Circuit Court, February 27, 1905.]

Hull, Haynes and Parker, JJ.

SAMUEL HILDEBRAND v. TOLEDO (CITY) ET AL.

1. OBJECTION THAT SEWER IS NOT AVAILABLE TO CERTAIN PROPERTY NOT SUSTAINED, WHEN.

An objection by an abutting property owner to a sewer assessment, based upon the ground that the sewer is not available to his lots, is not sustained where the proof shows that the lots for a distance of from fifteen to fifty feet back towards their rear, are on a level with the grade of the street in which the sewer is built, from which points they descend from forty to sixty feet to a river bounding them on the rear, and the sewer is from fifteen to seventeen feet below the surface of the street and it also appears that with respect to several of the lots the houses and improvements thereon are so built as to permit the carrying off of sewage even at cellar levels through such sewers.

2. PETITIONING FOR SEWER DOES NOT ESTOP PETITIONER FROM CONTESTING VALIDITY OF ASSESSMENT, WHEN.

The mere fact that an abutting property owner petitioned for a sewer improvement, and stood by without objection or protest and saw it built, does

not estop him from thereafter contesting the validity of the assessment against his property to pay the costs thereof, on the ground that his property is not specially benefited thereby.

3. FAILURE TO PREVENT POLLUTION OF WATER DOES NOT ESTOP CITY FROM BUILDING SEWER, ETC.

The fact that a municipality owning lands abutting on a stream has not taken wholly effective measures in all cases to prevent the pollution of water thereof which goes into its waterworks system, will not hinder or prevent it from taking measures, such as by building a sewer, to divert the sewage to another course; nor will such fact prevent the collection of an assessment, levied against the property specially benefited by such sewer, to pay the cost thereof.

4. RIGHT TO POLLUTE WATER COURSE NOT PART OF RIPARIAN RIGHTS.

The right to pollute the waters of a natural water course forms no part of the riparian rights of the abutting owners; and, in order to prevent such pollution, it is not essential that a municipality, or other riparian owner who is affected thereby, should condemn any right which such abutting owner may have or claim in the water.

5. MUNICIPALITY GUILTY OF POLLUTING STREAM NOT ESTOPPED FROM PREVENTING POLLUTION BY OTHERS, ETC.

A municipal riparian owner is not estopped from exercising its right and power to prevent the pollution of a natural water course, simply, because it has been guilty of the same offense by emptying its sewage into the stream. Hence, the collection by a municipality of an assessment, to pay the cost of constructing a sewer to carry off sewage which otherwise would be drained into the stream, cannot be enjoined merely because the municipality had also emptied its sewage into the stream.

6. ADEQUATE LOCAL DRAINAGE MUST HAVE PERMANENCY OF STRUCTURE AND OF CONTROL, ETC.

Lots are not provided with adequate local drainage, such as will exempt them from paying their share of an assessment levied to pay the cost of a sewer improvement, unless the right exists to dispose of sewage as it is at the time being disposed of, and the right to so continue is one that cannot be interfered with; the present right must include not only the idea of permanency of structure, but also of control. Hence, a claim of adequate local drainage, based upon the right to allow sewage to drain into a natural water course running through a municipality, is not sustained, where such drainage will pollute the stream and create a nuisance, and imperil the health of other riparian owners.

APPEAL from Lucas common pleas court.

C. W. Everett and M. D. Merrick, for plaintiff.

U. G. Denman and F. D. Crane, for defendant.

## PARKER, J.

A large number of persons join here as plaintiffs, and they bring their action to obtain relief from assessments laid upon their lands and lots on account of a sewer in this city. The action was begun in the court of common pleas and is in this court upon appeal. Their lots and lands are described in the petition, and it is only necessary to say with respect to their location, in a general way, that they lie along the bank of the Maumee river in the upper part of the city of Toledo in the

Hildebrand v. Toledo.

vicinity of where the waterworks standpipe and power house, etc., stand, extending from along in that vicinity up the river; and at about that point the water which is supplied to said city by an intake pipe, is taken from the Maumee river. These are all so-called "river lots;" they face upon Broadway and extend from Broadway back to the river, the owners of said lots having the ordinary riparian rights attaching to lots and lands along the river. The sewer on account of which their lots and lands are assessed, begins in Broadway and extends along the fronts of their lots until it connects with another sewer by which the sewage is carried in a northwesterly direction until it empties into Swan creek. By Swan creek it is brought down a distance of perhaps three miles or less, into the Maumee river at a point three miles below the waterworks plant or power house. The sewer at the front of these lots is from sixteen to seventeen feet below the street grade. The greater part of each of these lots is below the street grade. The depth of the lots upon the street grade, that is to say at the same elevation as the street grade, varies from fifteen to fifty feet and it appears that all of the lots have parts that abut upon the street that have as great an elevation as the street grade. From these points—from fifteen to fifty feet back from the street—the lots descend from forty to sixty feet with more or less abruptness to the water, and the whole depth of each of the lots is from 150 to 250 feet.

No fault is found with the proceedings except in the matter of the laying of the assessments. No complaint is made of any irregularity in the proceedings affecting the validity of the assessments, but it is claimed that no part of the costs of this sewer may be rightfully laid upon these river lots, for several reasons:

First. Because they have "sufficient natural drainage and sewerage into said river," and under the statute original Sec. 2380 (repealed 96 O. L. 96; see Lan. R. L. 3604; B. 1536-213; 96 O. L. 40, Sec. 53), where a lot has sufficient natural drainage, it cannot be assessed for artificial drainage.

Second. Because the sewer is not available to these lots, it being laid at too high a level above these lots to make it possible for these lots to use it for the disposal of their drainage.

The attack is upon the assessment *in toto.* If any part may be sustained, it is not shown nor contended that the amounts levied are too large.

Disposing of the second claim, *i. e.,* that the level of the sewer is laid too high to be available to these lots, the proof shows that the fronts of the lots, as I have said, on the street, for a distance of from fifteen

to fifty feet back towards their rear, are on a level with the grade of the street; that from this point they descend to the river, so that it is apparent that these parts of the lots so on the level of the street, are from sixteen to seventeen feet above this sewer, and, therefore, they are in a situation so that they could use this sewer for sewage. In the case of many of these lots the houses and improvements upon them are built towards the fronts of the lots and on levels permitting of the carrying of sewage from closets, etc., even at cellar levels, into this sewer, and, therefore, they cannot escape all the burdens of the costs of this sewer on the ground that the sewer cannot be used for them; and, as before stated, if any part of the assessment may be upheld, it is not shown that the amounts levied are excessive; there is no claim of that kind made and no evidence submitted that would enable us to consider it if the claim were asserted; so that we find and hold that the plaintiffs have failed to sustain that ground of relief.

There remains the other ground, *i. e.*, that they have and always have had, sufficient natural drainage or sewerage; and this they assert with respect not only to the parts of lots which lie on the side of the hill, but with respect to the parts that are at as high or higher levels than the street grade.

This allegation of fact the city denies. It is conceded by the city that the property lies so that it may be readily drained into the river and so that its sewage may be readily disposed of by emptying the same into the river; but the city insists that the rights of the proprietors to thus dispose of their sewage is qualified by the rights of the city and the community and persons having riparian rights in and to the river and especially of the lower proprietors, to have the stream kept pure, and by the right and power of the city in the exercise of its police and governmental power to prevent the putting of anything impure into the river that may contaminate or render unwholesome the water supply of the city; and the city contends that the plaintiffs' right to cast impurities into the stream, as thus qualified and subject to control and even prohibition, does not amount to adequate means or facilities for sewerage, within the purview of the statute.

And the city further says that in this particular instance the casting of sewage from these lots into the river will contaminate the water so near to the intake of the waterworks system whereby water is furnished to the residents of the city for drinking and culinary purposes, that such water will be rendered impure and unwholesome, and that part of the purpose and design of the city in diverting this sewage and other sewage that may originate on these lots and in that locality, to Swan

creek and thence into the river, is to accomplish the sanitary result of keeping the water pure in the region of the waterworks intake.

The plaintiffs assert, in part in their petition (evidently in anticipation of this defense) and in part in their reply, that the drainage and sewage from their lots does not or would not pollute the water of the river so as to render it inimical to health or in any way injurious to the people using the water of the river for drinking or culinary purposes. They also aver in their petition:

"That the said council of said city are trying to prevent said landowners from using their natural and adequate sewerage and drainage, to wit, the Maumee river, for the drainage of their said lands, and are trying to compel these plaintiffs to drain into Swan creek over a mile away, at a very large expense to plaintiffs, all on the ground and for the reason to preserve the purity of the water of said river for drinking and culinary purposes for the people of said city generally; that the public waterworks of said city located on said river takes water from said river a short distance below plaintiffs' said property, and the said city of Toledo is seeking to prevent these plaintiffs from utilizing the natural drainage of their lots for the benefit of the public at large of said city.

"That the council of said city drain the sewers of said city into said river below said waterworks and thereby use said river for the outlet of its sewers, and by the construction of said sewer No. 858 the said council seeks to prevent these plaintiffs from using the natural, sufficient and adequate drainage of their lots and to compel them to pay for the useless and expensive sewer without any special benefits to the plaintiffs' said lands.

"That it is one of the property rights of the owners of each of said lots and parcels of land bounding on said river, to drain his real estate into said river, and such right has never been condemned, acquired or taken away by the said city or otherwise."

And also in their reply:

"Plaintiffs further say that the sewer described in plaintiffs' petition and constructed in Broadway empties into the Hawley street sewer, which empties into Swan creek, which empties into the Maumee river about one mile below the public waterworks of said city; that the water in the Maumee river flows up or down said stream according to the direction of the winds; that when the winds are from the northeast, which is a considerable portion of the time, the water of said river flows through the said city southwesterly up stream past the mouth of Swan creek and all the sewers constructed by said city into said river and

beyond the public waterworks and thereby carries the sewerage emptied into said Swan creek and said river by the sewers of the city including the said Hawley street sewer up past the waterworks of said city, where the said waterworks takes water for the supply of the inhabitants of the city, and thereby the Broadway sewer pollutes the water of the said Maumee river, and these plaintiffs say that when plaintiff's said property is drained and sewered into said Broadway sewer as constructed by the said city the sewerage therefrom ultimately empties into the Maumee river, and the water of said river will be affected the same as if plaintiffs' lots were drained and sewered into said river direct."

These allegations are denied by the city. Those averments in the petition are specifically denied, and those averments in the reply are denied under the law. Now the plaintiffs by these averments deny that they do or will pollute the water of the river.

Secondly, they assert as an absolute right their right to cast sewage into the river, even if the result shall be to pollute its waters, and that that right will endure until taken away from them by condemnation proceedings whereby they would recover compensation on account of the deprivation.

Thirdly, they seem to assert, as a sort of estoppel, or as something that renders the city in *pari delicto,* so that it cannot come into court with clean hands—so that it must first cast the beam out of its own eye before it may rightfully complain of the mote in plaintiffs' eye—that the city is rendering the water of the river impure even at the waterworks intake, by emptying its sewers into the river at points lower down the river. This reminds one of the fable of the wolf that complained of the lamb, farther down the stream, that it was muddying the water; but the evidence gives it a slightly different aspect here.

Before proceeding to discuss the facts established by the evidence upon these issues and the law applicable thereto, I will dispose of another matter.

It is alleged in the answer by the way of estoppel, that the plaintiffs petitioned for this sewer and stood by and saw it built and made no objection or protest though they must have known they would be called upon to help defray the expenses of its construction. That appears to be true, as to some of them at least, but we find nothing in that to estop them from insisting that they shall not be compelled to pay any part of the cost on the ground that they are not at all specially benefited. They may well ask the city to make an improvement in their part of the city that may operate as a general improvement to that

Hildebrand v. Toledo.

quarter of the city, without waiving their right to be exempt from any special assessment unless they receive a special benefit.

Now I shall give a little attention to the evidence upon these disputed questions, as to whether the plaintiffs are rendering the waters of the river impure at a point where it is likely to affect deleteriously the waters used for culinary purposes and drinking purposes by the city, and as to whether the city is offending in the same way or in the same degree. We have listened to the testimony of the people of the neighborhood who are unlearned with respect to the science of bacteriology, that has been brought forward here; men of ordinary information and judgment; men generally who were interested somewhat in the controversy; and they seem to think, and undoubtedly do think, and testify that there is, at times, such a setback of the currents of the river from downstream upstream, so to speak, as to bring to the waterworks intake all the impurities cast from the sewage system of the city into the river lower down; and they also testify that the sewage that they empty into the river by their private drains is infinitesimal in comparison with the vast volume of sewage that is emptied in by the city lower down; and this they testify to in support of their allegation with respect to the rendering of the waters impure; that the city is the greater offender and does not stand in an attitude where it can complain, or, indeed, enforce any sort of regulation which will prevent impurities from being cast into the river by private proprietors.

It appears from this evidence and other evidence in the case, that from a point some distance above the waterworks intake down to the bay and thence to the lake, the water in the Maumee river and bay stands practically at a level. It has been described, and with propriety, we think, as a sort of estuary. Of course there is a current to the outlet at the lake—there must be—for all the waters that come from up the river find their way into the lake; and there is generally a very distinct current, especially about the center of the river. About the point where the waterworks powerhouse is situated, the standpipe, etc., there must be a double channel, the shallowest channel perhaps being that on the westerly side of the river and adjacent to these lots; and between that channel and the main or deeper channel are shallows and outlying islands. At times, when the winds are strong from the southwest, the waters in the river at this point and lower down, appear to be driven out into the lake so that the river falls below its normal level several feet, —perhaps four or five feet,—and at other times, when the wind sets in strong from the northeast and prevails for some hours, the water is

Lucas County.

driven back so that it not only reaches its normal level, but raises above that several feet. It is said that when this occurs—these winds from the northeast—there is a very perceptible current in the river upstream —the water flowing back. The fishermen who have made observations of this, testify to it, testify to the effect upon their boats, their nets, etc., their trot. lines, I think they call them. We are told by the gentlemen of scientific attainments who testified, that as a matter of fact this current is in the upper surface of the water—the upper levels, the upper third of the body of water;—that it is not so pronounced at the very surface as it is somewhat lower down, but that the lower two-thirds of the water is not much disturbed, and that, therefore, the matter in the river lower down than the waterworks intake, that which settles into or below this lower two-thirds of the water, does not carry upstream, and only the matter in the upper third of the water, flowing upon the surface, is carried upstream.

It seems that some of the matter upon the surface of this water that is carried upstream, appears at times to one looking at it and not making a careful analysis of it, as very obnoxious, so much so that one would not readily and willingly take it into his stomach, without some treatment at least; but the scientific men tell us that this is not as bad as it looks.

We know as a matter of common information, that we cannot judge of the wholesomeness of water, or the contrary, by its appearance; that sometimes muddy, roily, nauseating-looking water is comparatively harmless; whereas water that appears to the eye to be entirely pure and even sparkling, sometimes contains the most deadly poisons; and these men who have made a study of sewage and bacteriology—which enters into it to a great extent—say that the matter emptied into the river from the sewers, offensive matter, poisonous matter, the matter that would be injurious to the health of the people, settles to the bottom of the river, and that even where the winds, as in this instance, prevail from the northeast so as to carry the water up the stream, poisonous matter from the sewers is not to any appreicable degree, carried up to the waterworks intake.

This testimony relative to the effect of the sewage which is emptied into the river below the waterworks intake, stands uncontradicted; we must rely upon it; we cannot despise or lay aside the testimony of these men. They are learned in these matters. They are called in to assist and guide the court and their testimony is not disputed. Often, where expert testimony is given, other experts may be found to testify to an entirely contrary state of facts; but in this case experts were not

Hildebrand v. Toledo.

called on behalf of the plaintiffs, and we are bound to say that this testimony should, in our judgment, prevail over that of the opinions of these men upstream who have formed their judgment from simply observing casually the appearance of the water. I say this with respect to the sewers emptied down the stream; and I should say that the testimony shows that sewers are emptied into the stream as alleged in plaintiff's pleadings, by the city, at Swan creek and lower down, and one or two sewers nearer to the waterworks intake.

There is other testimony upon this subject to which we are bound to give weight and consideration—though it was a revelation to us—and that is, that less harm results from the large main sewers, especially where they traverse a considerable distance, even though they carry a large amount of sewage, than results from these small private drains emptying their sewage which originates close to the fresh water and is emptied directly into the fresh water. I cannot undertake to recite, or even state—except in the most general and unscientific way—what these gentlemen have testified to; but the effect of it is, that as this sewage flows along in the sewers before it reaches the fresh water, it becomes not exactly purified, but is rendered harmless in a degree; that the bacteria which are injurious to life and health are assailed and combated and destroyed by other bacteria which are not injurious to the life and health of persons, and that, if the sewage is carried far enough before it reaches the fresh water, these noninjurious bacteria wage upon the others a war of extermination and entirely destroy them unless fresh water is reached before their work is completed. But, if the injurious bacteria reach the fresh water without being thus destroyed, they may survive for a considerable length of time and be carried a considerable distance in the fresh water, where they receive oxygen, upon which they thrive. Instances are given of such bacteria being carried five and even ten miles in a stream of fresh water. On the other hand the sewage emptied from the houses directly into the river carries with it, without any destruction or mitigation, all of the disease breeding bacteria, and when they reach fresh water there they survive and thrive.

So the conclusion is drawn by these scientific men from these facts —which are testified to as facts—that even if this water from the city was pushed up by the winds from the northwest towards the intake at the waterworks, it would carry but little, if any, of the disease breeding bacteria or poisonous substance; whereas the sewage emptied into the river by these proprietors along the bank and originating close to the bank, is carried by the natural currents of the river down to the water-

works intake and there is taken into the waterworks system and ulti-
mately into our systems, if we drink water.

Now that is the situation as it is disclosed to us—stated in a general
and imperfect way—and as applicable to the issues here presented.

Taking up these question presented in the order thus stated:

First. Does or will the sewage from these lots pollute the water
of the river so as to make their use for drinking and culinary purposes
inimical to the health of the people of the city?

From what I have already stated it is apparent that we are led to
the conclusion that we must answer this in the affirmative. It does not
appear that there is a great deal of this sewage being emptied into the
river above the waterworks intake just now; but the plaintiffs are assert-
ing their right to continue to empty it; and, apparently, if this right is
maintained, sewage of this character will continue to be emptied in, not
only from these lots but from other lots all along up the river, in in-
creasing volume, until the water will be rendered entirely unfit to be
taken into our waterworks system.

Second. Have the plaintiffs such right to drain sewage into the
river as they assert and enjoy, without regard to consequences, until it
is taken from them by appropriation proceedings? That is one of the
rights which they assert here.

We are cited to the case of *Blue* v. *Wentz*, 54 Ohio St. 247 [43 N.
E. Rep. 493], a case which does not seem to give us any light upon this
particular question nor to be of any especial aid to us. It lays down
the general principles applicable to surface drainage, defining what
may be called the dominant estate and the servient estate, showing
the nature and extent of the rights of the dominant estate to flow its
water onto and over the servient estate. That is not involved here,
we think.

We are cited to Gould, Waters and I read from Sec. 544:

"But where perceptible pollution is shown to the damage of the
plaintiff, an injunction will be granted to prevent its continuance, al-
though the damage may be merely nominal. * * * A corruption
of water will be enjoined if causing injury to the plaintiff in any right-
ful use of the water, as by rendering it unfit for manufacturing pur-
poses, or for domestic uses, or for the drink of cattle, or for fish to live
in, or when it impairs the health of those in the community. So the ac-
cumulation of corrupting deposits in a stream, the pollution of a canal
or ditch, the discharge into a stream of heated water, or of the okal
of abattoirs, or of sawdust from a mill, will be prevented by injunction.
And the fact that others also pollute the stream, and that the pollution

Hildebrand v. Toledo.

caused by the defendant is an inconsiderable part of the whole corruption is no bar to an injunction. If the defendant has a right to discharge corrupting matter into the stream to a certain extent, he may be enjoined from polluting the stream beyond his right; but the plaintiff of course must show that there has been such an increase. The same rules apply to the corruption of navigable or tidal waters as to private streams.''

*Mansfield (City)* v. *Balliett*, 65 Ohio St. 451 [63 N. E. Rep. 86; 58 L. R. A. 628], is cited to us. That case is so radically different from this that it may be said to stand in direct opposition, or to show the opposite side of the shield, for there the municipality was corrupting the waters of a stream and the private proprietor was insisting that he had a right to have the waters come down to him pure and uncorrupted and that that right could not be taken away from him by the city by the pollution of the waters unless they first condemned his right to have the waters come to him pure and uncorrupted. That right was sustained in favor of the plaintiff. I need not stop to consider the case farther. The claim here on the other hand, seems to be, that the right to pollute the waters is a part of the riparian right of these proprietors, that is to say,—if we are to give heed to what we regard as established by the evidence here, *i. e.,* that they are polluting this water; though perhaps it is hardly fair to counsel to say that they undertake to maintain this position, because their claim is, that they are not polluting the waters. But since we find that they are doing so, we may say— that the right to pollute the water is no part of their riparian right, and to prevent them from polluting the water it is not necessary for the city, nor for anybody else, to condemn any right that they may have in the waters. Therefore, this question as to their right, we answer in the negative.

Third. Does the fact that the city may not have taken wholly effective measures in all cases to prevent the pollution of such waters as go into the waterworks system, hinder or prevent them from taking such measures as they have taken in this instance to divert this sewage to Swan creek, or from enforcing the assessment for such sewer?

We think not. In the first place it should be borne in mind that the evidence discloses that the harm that may result from the sewer emptying lower down is trifling as compared with that resulting from such pollution of the waters above the intake. Also that if plaintiffs have the right asserted, the same right inheres in the proprietors of all property lying on and along the river above the waterworks intake, so that the utter destruction of the stream as a source of water supply may

result, unless the city shall condemn and extinguish the right of the proprietors to pollute the stream, and this, we have already said, the city is not required to do.

It is said that the city has no right to pollute the stream. But this is rather aside from the question that we have to consider here, we think. I read from Gould, Waters Sec. 545, upon that subject:

"The pollution of streams by municipalities and public bodies in charge of sewage and drainage has occasioned frequent exercise of the preventive powers of equity. Upon principle a public body has no more right at common law than a private person. Its duty to prevent public nuisance by taking care of the sewage or drainage of a district gives it no right to create another nuisance by the pollution of a stream. If special powers have been granted to it by statute for the performance of a given object, it is bound to act strictly within its powers. If it exercises such powers so as to injure the property of individuals, it is responsible for the injury as a tort, unless the act done was strictly necessary for the performance of the object for which the powers were granted; and in such case the remedy of the individual is under the compensation clauses of the act, or, in America, usually under the provisions for exercising the power of eminent domain. Any pollution of a stream by a public body, in taking care of sewage, is therefore a nuisance unless expressly authorized, and is liable to injunction."

To acquire the right to pollute waters condemnation proceedings are appropriate and necessary. But this violation of the law by the city in this respect does not deprive it of its power to mitigate the evil; that is, assuming that it has violated the law by emptying its sewage lower down. It is not necessary that the city shall undo or correct all that it may have done or permitted as a public agency in the matter of drainage deleteriously affecting the waters of the river either above or below the intake before it can begin to exercise the power vested in it to so plan and provide for the disposal of sewage as to keep the water supply of the city pure and wholesome, or comparatively so. Any blunder that it may have made in this respect does not divest it of jurisdiction or leave it shorn of its power. Were it not so its blunders, if any, might forever prevent it from improving sanitary conditions. The case is not that of a discrimination in the exercise of police regulations, like that in the case of *Sipe* v. *Murphy,* 49 Ohio St. 536 [31 N. E. Rep. 884; 17 L. R. A. 184], to which we have been cited.

This attempt to prevent the discharge of sewage into the river above the intake in pursuance of the authority found in Lan. R. L. 3709 (R. S. 2433; B. 1536-544) is of course wholly aside from and inde-

pendent of the question whether both plaintiffs and the city may not have violated Lan. R. L. 3709 (R. S. 2433; B. 1536-544), especially as amended April 20, 1904, since it was so amended. Whether they have done so or not, either or both of them, does not touch the question of the validity of this assessment laid to cover the expense of a sanitary measure adopted before the amendment of this statute. We conclude that the collection of the assessment cannot be prevented on this ground.

The remaining question—which is the primary question—is: Have the plaintiffs adequate drainage, and had they such drainage before this sewer was built? The answers made to the questions above stated, at the same time, in a measure, answer this. The plaintiffs had but a qualified right to discharge sewage into the river. The city has a right to prevent the discharge of sewage from their lots into the river directly, and has the right to divert it into Swan creek, and so into the river lower down. As said by the superior court of Cincinnati in *Frey* v. *Millikin,* 15 Dec. 122, 123:

" 'Adequate drainage for the usual purposes of sewerage' required to 'work an exemption for the land from the assessment'     *    *    * includes not only the idea of permanency of physical structure, as intimated by the court     *    *    *     but of control."

They must not only have the means and facilities for disposition of their drainage, but they must have a right to dispose of it as they are disposing of it, and the right to continue to do so, and a right that cannot be interfered with by the city, and that right we think they do not possess.

From *Ford* v. *Toledo,* 64 Ohio St. 92, 94 [59 N. E. Rep. 779], a case which went up from this court, I quote a single remark which indicates the opinion of the Supreme Court upon this subject. This was a case which arose in the northwestern part of this city where an outlet of a local sewer was being carried across some low lands and in some places was carried over the surface of the ground. The bottom of the sewer, in places, was higher than the lands, and yet an assessment for local drainage was sustained by this court with respect to those lands which were lying lower than the sewer. Manifestly in such case it could not be assessed so heavily as lands more favorably situated with respect to the sewer; but this assessment was sustained by this court and by the Supreme Court. In this case the parties undertook to escape from the burden of the cost of the sewer, insisting that they had sewerage facilities; that they could drain into Ten Mile creek, and possibly that was so; but we held that that was not sufficient, and made application of the principles that I have already stated.

This is the language of the judge delivering the opinion in the Supreme Court, upon that subject, page 99:

"The drainage of sewage into an open ravine in a city would be inimical to public health, and can hardly be considered such local drainage as the statute contemplates."

In the case of *Stanley* v. *Cincinnati*, 13 Dec. 223, a case decided by the superior court of Cincinnati, in the fifth clause of the syllabus, the same language is used:

"Drainage of sewage into an open ravine in a city is inimical to the public health and cannot be considered such local drainage as the statute contemplates."

In the case of *Wilson* v. *Cincinnati*, 7 Dec. 242 (5 N. P. 68 and 70), it was said with respect to a situation where the outlet might have been cut off by a private proprietor of the land and where the city perhaps might have had a right to interfere, page 244:

"But it is admitted that the old sewer begins and ends on private property; and therefore as it is subject to be closed up at any time, and has in fact no proper outlet, we think that it does not satisfy the requirements of the statute, and plaintiffs cannot claim exemption thereby."

That was also a decision of the superior court of Cincinnati.

These are all the expressions of opinion we find on the part of any courts as to this particular provision of the statute; but we think they are quite sufficient to warrant us in saying with respect to this case that these proprietors of these lots have no such right to permanently empty their sewage into this stream, the Maumee river, at the places where their lots touch the river, as exempts them from the cost of a sewer like this—intended to convey the sewage to a point where it may be harmless. We say this qualified right to drain into the river, which does not include the privilege of polluting the stream so as to create a nuisance, and so as to imperil the health of the people who get their water supply from the river below this point, does not amount to sufficient drainage under the statute or to opportunity for drainage that will exempt plaintiff's property from this assessment. This sewer specially benefits their property because it affords them the only feasible and lawful means of sewage disposal from their lots, and it is available for at least so much of their lots as lie near to or above the level of the grade of the street. What shall be done with their sewage that cannot be conducted into this sewer, we are not called upon to say. Presumably they are not assessed on the theory that this sewer affords a means of disposal thereof. One thing seems clear: that they

Hildebrand v. Toledo.

cannot lawfully put it into the river until it is sterilized and rendered harmless, and they should not be permitted to do so.

There is another case which throws some light upon the question and to which I will refer, a decision by the United States circuit court for the southern district of Ohio, *Cleneay* v. *Norwood* (*Vil.*), 14 O. F. D. 469. In that case the parties were undertaking to escape the burden of a sewer assessment on several grounds, and one ground was, that the sewer did not have a proper outlet, that the outlet that was given was one that might injure the health of the community. In discussing that matter, Judge Thompson says, page 472:

"It is claimed, however, in the bill that this sewage system has not a proper outlet 'and the complainants have as yet no sewers, in fact, to drain their said lots and lands,' and consequently have not been benefited by the improvement, but in the stating part of the bill it is alleged upon information and belief:

" 'That said sewerage system consists of a large main sewer, into which various smaller sewers, known as laterals or branches, drain, and that the said main sewer, which is the only outlet to the entire system, empties into a small stream, which is not a river or other proper place as required by Sec. 2370 Rev. Stat. of Ohio, and which stream is mostly stagnant during the larger part of the dry or summer season, and in which at no time is the volume of water or the current sufficient to carry off the sewage. This stream is known as "Duck creek," * * * '

"Original Sec. 2370 (repealed 96 O. L. 96; see Lan. R. L. 3633; B. 1536-241), provides as follows:

" 'The plan so devised shall, in the discretion of the council, be formed with the view of the division of the corporation into as many sewer districts as may be deemed necessary for securing efficient drainage and sewerage; each of the districts shall be designated by name and number, and consist of one or more main or principal sewers, with the necessary branches and connections, the main or principal sewers having their outlet in a river or other proper place; and the districts shall be so arranged as to be independent of each other so far as practicable.'

"By the express terms of this section the determination of what is a 'proper place' is confided to the discretion of the council and the lot owners are bound by its action. It is not shown that there is no outlet or proper place, but only that Duck creek, into which the main sewer empties, 'is mostly stagnant during the larger part of the dry or summer season, and in which at no time is the volume of water or the current sufficient to carry off the sewerage.'

"Manifestly, in the opinion of the complainants, the outlet is in-

Lucas County.

sufficient, but it is not stated as a fact that Duck creek fails to furnish any outlet for the sewer. The language, 'and at no time is the volume of water or the current sufficient to carry off the sewerage,' in the connection in which it is used, means that it does not carry off all the sewerage, not that it does not carry off any of the sewerage. If it were a fact that the creek was insufficient to carry off any or a large part of the sewerage, unequivocal and explicit language would have been used in stating the fact.

"The bill also calls attention to certain statutes enacted by the general assembly of the state of Ohio in the exercise of the police power prohibiting the pollution of streams, etc., and prescribing penalties for the violation thereof. The village or its officers and agents may be liable for the violation of these statutes, but that fact affords no ground for setting aside the assessment."

And that I quote with more especial reference to the claim that these people should be relieved because the city is emptying its sewerage into Swan creek and thence into the river. Now what we might feel called upon to do in a case that we might suppose, of the city emptying its sewage by some system directly into this river at this same point in the manner in which it is emptied there by the plaintiffs, we are not called upon to say. It might present a case which would require different action upon our part, but this, as we view it, is a very different case from that.

Our judgment is, that the petition shall be dismissed and judgment will go against the plaintiffs for costs.

**Hull** and **Haynes, JJ.**, concur.

---

## NEW TRIAL—ATTACHMENT—APPEAL—BILLS OF EXCEPTIONS.